**AMERICAN EAST INDIA COR-
PORATION**

**v.**

**IDEAL SHOE COMPANY.**

**Civ. A. No. 71–856.**

United States District Court,
E. D. Pennsylvania.

July 16, 1975.

Donald K. Joseph, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiff.

Richard M. Rosenbleeth, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

CLIFFORD SCOTT GREEN, District Judge.

### I.

This is a contract action for goods sold and delivered. However, the action is considerably complicated by the involvement, in the transactions which are the basis of this lawsuit, of another company, which originally received the purchase order for goods sold and delivered and the factor of this latter company.

Plaintiff, American East India Corporation (American), delivered goods to the defendant, Ideal Shoe Company (Ideal), and defendant paid the monies due, minus a deduction for estimated damaged and/or inferior goods, to a third party factor, Commercial Trading Corporation (Commercial). Commercial was the factor for a fourth party, Walker Trading Corporation (Walker), which had originally received purchase orders for goods, identical to those delivered to the defendant by plaintiff.

We hold that American is entitled to judgment against Ideal for the invoice price, diminished by a subsequently specified amount, consisting of a charge back for damaged and/or inferior goods and an amount representing damages for conversion of the contract right in issue, comprised of the purchase orders referred to above[1].

### II.

### A.

The parties and other characters to the drama are as follows.

Plaintiff, American, is incorporated in the State of New York and has its principal office in New York City. Its president, at all times material hereto, was and is Eugene Connelly, who has been in the export-import business since 1938, except for a four and one-half year hiatus from 1940 to 1945, while he was in the Quartermaster Department of the United States Army. Mr. William Fleming was an administrative assistant to Connelly from 1963 to 1970 when he left American. Mr. Henry Baccash was, at the relevant times involved, the controller of American and is now its vice-president. Allan Fudell, another American officer, was the only person at American, other than Connelly, with signing power for the corporation.

Defendant, Ideal is a corporation organized under Pennsylvania Law, as a wholly-owned subsidiary of Food Fair Stores, Inc., with its principal office in Philadelphia, Pennsylvania.

Walker was formed in 1964 and was in the business of importing footwear from the Far East. From its inception, Walker was factored by Commercial. William Lynn was the principal in Walker and, during its entire period of operations, Walker was essentially a one-man sales operation. Lynn, himself, had been engaged in the import business prior to 1964 and previously had been the principal in an operation similar to that of Walker. At the time of trial, Lynn was a salesman for a corporation in the import business. Bernard Reicher was the secretary of Walker and, along with Lynn, the owner of Walker. Mr. Patrusky was Walker's accountant. Both Reicher and Patrusky knew people at Commercial and this relationship led Lynn and Walker to Commercial. Reicher had left Walker by approximately the beginning of 1967; Patrusky did not work for Walker from August, 1967 on. Nathan Fisher, a personal friend of Lynn's was instrumental in bringing Walker and American together; although Fisher himself had no formal

---

1. This memorandum shall constitute our findings of fact and conclusions of law under F.R. Civ.P. 52(a).

connection with Walker. Mr. Fisher, at the time of trial, was a buyer in the Far East. He has been in the import business for about 15 years and associated with numerous companies during this time; including pertinently the Woodbine Company.

Commercial is a corporation in the business of commercial financing. Mr. Gerald J. Grossman, an attorney, is vice president, secretary and treasurer of Commercial. Mr. Grossman handled most or all of the transactions between Commercial and Walker and was a member of the committee which followed the Walker account.

### B.

Commercial financed Walker continuously from February 19, 1964, when they entered into a financing agreement, until at least July, 1967. Walker ordered goods from overseas manufacturers in the Orient to fulfill orders it had received from domestic corporations. Commercial financed Walker's overseas purchases by taking out letters of credit to cover the manufacturing orders. Commercial also made advances to Walker to cover Walker's payroll and other expenses.

■ A letter of credit is a financing device which permits parties separated by great distances to deal with one another with assurance. The financier opens a letter of credit with its bank which letter provides for payment upon receipt of documents. The foreign manufacturer draws on the letter of credit from a designated foreign bank, and at that time delivers documents as required by the letter of credit. These documents are forwarded to the bank issuing the letter of credit, which delivers them to the purchaser of the goods, upon payment of the amount drawn against the letter of credit.

The Walker-Commercial agreement is dated February 19, 1964 and is signed by Lynn for Walker and by Grossman for Commercial. Essentially, the basic document provides for the purchase of Walker accounts by Commercial[2]. Sta-

---

2. The contract begins with a general mutual agreement clause, referring to ten paragraphs thereunder, and contains other items. Paragraph one provides as follows:

"The *Customer shall sell* to the Company and the *Company shall purchase* from the Customer *such of the Customer's accounts receivable, notes, drafts, acceptances and choses in action (herein called 'Accounts') as are acceptable to the Company.* The Company will pay therefor the full net face amount thereof, of which up to 80%, less the compensation hereinafter specified, shall be paid upon acceptance and purchase of such Account; and the balance, plus any overpayment and less any deduction by the debtor and less any unpaid charges hereunder, shall be paid, after payment of such Account, at such times as the Company may determine; provided, however, that no such payment need be made by the Company so long as any Account assigned hereunder shall be in any manner affected by any breach or violation of this agreement or of any provision hereof. *The Company shall purchase only such Accounts as it, in its sole discretion, may deem acceptable; and no failure or refusal of the Company, for any reason, to accept or purchase any Account hereunder, shall be deemed a breach of this*

*agreement.* The aggregate amount of unpaid assigned Accounts to be held by the Company hereunder at any time may be limited by the Company, in its sole discretion. *During the term of this agreement, the Customer shall not sell, pledge, assign or otherwise encumber or dispose of any of its Accounts to, or borrow any money thereon from, any party other than the Company.*" (Emphasis Added)
Paragraph five provides, in part:
"The Company hereby grants permission to the Customer, on the conditions herein specified, to collect the assigned Accounts, but such privilege may be terminated at any time by the Company without cause; . . . On any such termination, or at any other time and without any cause or any notice thereof to the Customer, the Company shall have the right to send notice of assignment to any or all debtors on assigned Accounts and shall thereafter have the sole right to collect the same."
Paragraph nine (9(a)), provides in part:
"Neither this agreement nor any portion or provision hereof can be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or in any manner other than by an agreement in writing signed by the party to be charged . . ."

pled to the back of the first page of the basic document is a small piece of paper, an apparent zerox copy, which is dated 2–19–64, by hand. This paper is entitled, "Rider To Accounts Receivable Agreement", and states that as additional security for all advances made to and to be made, Walker grants to Commercial a security interest in all present and future accounts and contract rights[3]. A financing statement with respect to this agreement, was filed on September 16, 1964 and appropriately renewed. This statement tracks the language of the rider and the proceeds box thereon is checked. This statement is signed by Grossman for Commercial and Reicher for Walker. The financing statement was filed on the first day, after the enactment of the Uniform Commercial Code (Code) in New York, McKinney's Consol.Laws, c. 38, on which such statements could be filed and was appropriately renewed so that the financing statement was in compliance with Article 9 of the Code at all times pertinent hereto[4].

The basic document reflecting the agreement between Walker and Commercial, was a form in existence prior to the adoption of the Code. After the Code was adopted in 1962, Commercial drafted the rider for attachment to its pre-Code document. The purpose of the rider is to obtain for the moneylender the maximum protection and interest permitted under Article 9 of the Code. Although Mr. Grossman's direct testimony did not, in any way, establish that the rider was attached by agreement, rather than independently by Commercial after the basic document was signed, his uncontroverted testimony on cross-examination makes it clear that the rider was attached to the basic document when the agreement was executed by Lynn for Walker.

The parties' course of dealing under their agreement can be summarized as follows. Lynn, on behalf of Walker, would obtain an order for goods from a domestic seller. Lynn would then send the details to an agent or factory overseas and he would receive the orders back with a price from the Orient, and he would submit these documents to Commercial with an application for a letter of credit. Grossman would review the application and determine whether or not they would finance the transaction. Grossman testified there generally was a varying margin requirement, although Lynn's memory was less than clear as to whether or not margin was required regularly. Margin is a portion of the face amount of the letter of credit that is used as a deposit. If Commercial approved the transaction, it would pledge its credit to the bank so that the bank would pay on the presentment of documents covering the goods. The receivables generated by delivery of the goods to the customer would be turned over to Commercial by Walker or paid directly to Commercial, in which case the Walker invoices would be marked payable to Commercial.

3. This Rider appears as follows:
RIDER TO ACCOUNTS RECEIVABLE AGREEMENT: Dated *2–19–64*
This will supplement the *existing Accounts Receivable* security agreement between us: 1. *As additional collateral security for all advances made to and to be made hereunder, Customer* hereby *grants* to COMMERCIAL TRADING COMPANY, INC., *a security interest in all present and future accounts and contract rights,* and in any case where an account or contract right has arisen from the sale of goods, the interest of the Debtor in such goods. The security interest of the Company in accounts purchased hereunder and any and all present and future accounts, contract rights and goods as aforesaid shall, in addition to securing advances made hereunder, secure all indebtedness which the Customer may at any time owe to the Company, whether fixed or contingent, present or future, or arising under this agreement or otherwise arising or acquired." (Emphasis Added)

4. There also existed a security agreement and a properly filed financing statement covering inventory and the proceeds thereof.

## C.

On July 22, 1967, Walker received purchase orders for the footwear involved in this dispute from Ideal. The footwear, covered by the purchase orders, was to be imported from the Far East. At about the same time, Walker received another large order from C. R. Anthony. In sum, Walker needed a letter of credit in the amount of $54,000.

In August of 1967, Lynn first requested a letter of credit to cover these orders from Gerald Grossman of Commercial. There were several conversations between Lynn and Grossman concerning the request for a letter of credit. Grossman refused to provide a letter of credit without placement of additional margin by Walker. Specifically, Gerald Grossman, with whom Lynn negotiated, insisted upon a 50% margin—requiring in this instance $27,000. Moreover, this amount of margin was not the only condition. Grossman also required that the Walker account be brought "more properly in perspective". This comment is explained by Grossman's testimony that Walker was not operating as profitably as Commercial would have liked, the merchandise had not been of adequate quality, and some customers had not received merchandise. The evidence supports a finding that, at about this time, Walker was not paying the bills required to get the merchandise to customers, and that Commercial, itself, was taking an active role in arranging for the delivery of goods, etc.

Mr. Lynn's attempts to raise funds to meet the margin requirement failed, notwithstanding his misperception that the required margin was $10,000. The only real attempts to raise the money was through private channels which proved unavailing. This approach is not surprising in light of the fact that, at that time, the entire Walker operation was comprised of Mr. Lynn and one secretary. Bernard Reicher had pulled out of Walker; Walker's books were so far behind that Commercial could not properly audit; and, Lynn had gone through personal bankruptcy, approximately two years previously. Although Mr. Grossman offered to put Lynn in touch with some people who might help Lynn raise the margin, Lynn never availed himself of this opportunity.

Clearly, Gerald Grossman was aware of the rather perilous position of Walker at the time and, in fact, this situation was, according to Mr. Grossman's own testimony, instrumental in his decision. Commercial performed periodic audits of Walker. Moreover, Gerald Grossman knew other people who were in the Walker organization. Both Mr. Reicher and Mr. Patrusky knew people at Commercial and at least Mr. Patrusky knew Gerald Grossman. In fact it was these contacts which had produced the financial link between the two companies. Moreover, by this time, both Reicher and Patrusky were no longer connected with Walker.

## D.

The above sequence of events sets the stage for the entrance of American into the picture.

In 1955, American, incorporated as early as 1951, began active operations with Connelly as its president. It acted as an import agent until 1959, when it also took on exports. The export business expanded, and in approximately 1960–61, American dropped its import business in burlap and tea. The growth of the export business continued and, in 1966, Connelly decided to try imports again and further decided that footwear would be a good item. Pursuing this general objective, American took on, as a selling agent, an outside company, by the name of Woodbine. The Woodbine Company was brought to the attention of Connelly by his administrative assistant, Fleming.

Woodbine obtained orders for American. If American deemed the orders satisfactory, American would obtain an overseas manufacturer, establish a letter of credit, have the material shipped to American, and deliver the goods to the

buyer. Woodbine was selling for American in the New York and New England areas. When Woodbine went to work for American, it brought with it, at least, two contracts with customers for footwear. These contracts were assigned to American and it imported the footwear under its own letters of credit.

In December of 1967, the export business was still growing and Connelly wanted to broaden his import business, specifically in footwear. It was this desire that led to the transactions which prompted the present dispute. The chain of events leading directly to the present imbroglio are as follows.

Aside from its principal offices, American had an office in the Marbridge Building in New York City, an office building occupied by "shoe people". In September of 1968, Fleming had run into one Nat Fisher, while in the Marbridge Building, and they had coffee together. Fleming knew Fisher through his dealings with Woodbine. Fisher inquired as to whether American might be interested in developing a relationship with Walker similar to that which it had with Woodbine. On that same day, Fleming, along with Fisher, met with Lynn in the Walker offices in the Marbridge Building. Fleming had further meetings with Lynn and Fisher; at one of which Baccash was introduced to Lynn and Fisher. During all these meetings, no mention was made of Commercial or any other factor. The arrangement sought was that of a sales agency. Neither Fleming nor Baccash ever thoroughly checked Walker out financially, relying solely on general business information that Walker was in the business of selling shoes with its principal strength west of the Mississippi; except for the Ideal account. Neither Baccash nor Fleming thought it necessary to check Walker further for they saw no danger to American based on the nature of the contemplated relationship with American. Fleming was led to believe that Walker sought a connection with American because the volume of orders coming to Walker had grown beyond Walker's ability to handle them. Moreover, Fleming assumed that Walker had financed its particular transactions the way that American did.

Sometime after Fleming initially met with Fisher and Lynn, he brought the situation to the attention of Connelly who naturally, in light of his objective noted above, was interested.

A meeting was eventually held on December 18, 1967, at the offices of American. At this meeting, Messrs. Connelly, Baccash, Fleming, Lynn, and Fisher were present. Connelly told Lynn that American wanted a sales agent but that there could be no competition with American's existing agent—Woodbine. Connelly set out the specific terms and conditions of the relationship as follows: all orders were to be taken in the name of American and sold for the account of American; if American approved an order, it would place the contracts with a manufacturer of choice; American would establish its own letters of credit, import the goods in question and deliver the goods to the buyers. The financial terms were set so that initially Walker's compensation would be the excess of price over cost plus ten percent thereof. After gross sales had reached $250,000 volume and it appeared that a good working relationship had been established, American would lower its percentage to seven and one-half percent of all cost. Lynn stated that they had some orders which he wanted to apply to the $250,000 figure immediately. Connelly, who had to attend another meeting, told Lynn to work out the details with Fleming and Baccash.

After Connelly left the meeting of December 18, Fleming and Baccash reviewed the details of the purchase orders Lynn already had. Fleming checked Dun and Bradstreet on Ideal and Anthony and learned they were both A–1 accounts. The purchase order of Ideal was dated July 22, 1967 with due dates on some having already passed. Fleming was concerned about the due

date but the day after December 18, Lynn assured Fleming that the merchandise manager at Ideal had approved a late delivery. On that same day, Fleming started preparing to apply for a letter of credit which was signed by a Mr. Fudell, who, aside from Mr. Connelly, was the only one with signing power for American. Moreover, Baccash told Lynn to get purchase orders in the name of American. Lynn, however, never did so and American, as late as February 28, 1969, planned to bill Ideal with Walker invoices with a stamp directing payment to American.

On December 22, 1968, Connelly left on a trip which took him out of the country and eventually to the Far East. At the meeting of December 18, Connelly had offered to contact any Far East suppliers that Walker knew of during this trip. Upon his arrival in Taiwan, Connelly did so. In addition to meeting a manufacturer with whom American had previously dealt, Connelly met with representatives of Fu Yong Rubber Industrial Co., Ltd. (Fu Yong). Fu Yong had already received manufacturing instructions from Walker on the Ideal orders. Connelly told Fu Yong that those goods were to be shipped to American and that American would arrange the letters of credit. Connelly further told Fu Yong that American would be dealing with him and that Walker now was an agent for American similar to Woodbine, with which Fu Yong was familiar. Connelly was surprised to discover that Fu Yong, at the time of Connelly's arrival, had not been fully informed of the respective roles that American and Walker were to play. As a result, Connelly wrote a letter to Fleming which Fleming received on January 22, 1968 in which Connelly instructed Fleming to make sure the orders to Fu Yong were in the name of American, as American was the principal in the transaction. At this point, there was nothing further that Fleming could do in light of the fact that the shipment was on or almost on the water.

On December 22, 1967, American had obtained a letter of credit for the orders received from Lynn, including the Ideal orders, in the amount of $35,849.04, in favor of Fu Yong. Fu Yong, before the letter of credit was obtained, had already manufactured against Walker's instructions without a letter of credit.

In this case, the documents required under the letter of credit were invoices, a customs invoice 5523—material breakdown, and ocean bill of lading with notification to American.

On or about January 24, 1968, these documents were delivered to American by Bank of America, along with its debit advice charging American $15,552.54, reflecting the $15,533.12 drawing against the letter of credit by Fu Yong and a commission of $19.42. The documents delivered were the ocean bill of lading of the shipper States Marine Lines; the invoice of Fu Yong, the Fu Yong packing list; United States customs material breakdown invoice, form 5523, entitled Invoice Details for Footwear; Fu Yong's weight breakdown of all components; and the Special Customs Invoice.

In exchange, since American did not immediately pay the Bank of America, Mr. Rudell executed a Trust Receipt to Bank of America that, until payment, it would hold the documents in trust for Bank of America. On March 25, 1968, American paid the $15,533.12, received back the original Trust Receipt marked paid, and was charged interest for the amount from January 24, to March 25, of $177.66, making the total cost to American for the goods from Fu Yong plus bank charges (excluding shipping, customs, and insurance and overhead) $15,710.78.

Previously, by check dated February 8, 1968, American had paid its insurance agent $122.28 for insurance on the Ideal goods for the trip.

On a customs entry form, noting a duty of $3,106.60, dated February 21, 1968, American declared that it was the

importer of record and was importing for its own account.

On February 26, 1968, States Marine, the company bringing the footwear by steamer from Taiwan notified American as "consignee" that the steamer was expected to dock on March 3, 1968 and that the cost of shipping from Taiwan to Philadelphia was $1,494.59.

On February 27, 1968, American sent to its forwarding company, Allen Forwarding Company, in Philadelphia, a check for $4,601.19, covering the shipping of $1,494.59, and $3,106.60 for estimated duty. Allen's subsequent bill of March 8, 1968 included other miscellaneous charges for services in forwarding the goods of $36.75 which was paid immediately.

At about this time, Commercial re-entered the picture. On February 14, 1968, Commercial wired Ideal that:

"All payments for merchandise received from Walker . . . are to be made only to [Commercial] . . . Payments to any other party may subject you to liability for double payments."

Commercial sent letters to Ideal, confirming this telegram on February 29, 1968 and March 4, 1968.

No one at American was aware of Commercial or its claim until February 28, 1968. On that day, Lynn called Baccash and informed him of the Commercial telegram. Baccash immediately brought the matter to Connelly's attention, and Connelly told his people not to let go of the goods until they received assurance that they would be paid.

At that time, Baccash informed Connelly that he had received assurance. On February 19, Baccash had spoken to a Miss Volpe, an accounts payable clerk at Ideal. Lynn had suggested the call when Baccash, knowing the goods were soon to arrive, expressed concern that Lynn had not procured purchase orders in the name of American. Baccash told Miss Volpe that American was going to deliver against the Walker purchase orders and asked her to remit to American against Walker invoices, and Miss Volpe said that Ideal would do so [5]. Moreover, Connelly relied on the fact that all the documents were in the name of American [6].

On this same day, February 28, 1968, American sent twenty of its own invoices to Ideal, totalling $27,542.40. On February 29, 1968, American issued new instructions to its forwarder, Allen Forwarding Company, revoking its prior instructions consigning the shipment to Walker.

On March 7, States Marine Lines notified American that the steamer had completed its discharge at the pier in Philadelphia. Upon the authorization of American, on that same date, Allen Forwarding Company directed release of the footwear to Stanley Salkowitz Trucking, for delivery to Ideal. Salkowitz's overland bill of lading originally contained

5. Our finding of this conversation and its content is based upon the testimony of Mr. Baccash which we credit. The deposition of Miss Volpe, who had died prior to trial, was made part of the evidence in the case. She did not remember speaking to Mr. Baccash, and obviously did not recall the content of the conversation as related by Mr. Baccash at trial. However, Miss Volpe did recall a phone call from Lynn in which Lynn informed her that certain shipments under purchase orders directed to Walker by Ideal would be billed for through American. We find Mr. Baccash's testimony credible and corroborated in certain details. However, as we explain, infra, the only legal significance which we attach to this conversation is con-

trary to certain of the legal theories advanced by the plaintiff.

6. Also, about this time, Fleming at the suggestion of Lynn, drafted a writing purportedly setting out the agreement between American and Walker; which was post-dated to December 12, 1967. Connelly, however, refused to sign it because it was backdated and because he saw no utility or honesty in signing a written agreement after problems had arisen. Connelly had instructed Fleming to draw an agreement prior to his departure for the Far East; however, due to the rush of the holiday season, the agreement was never prepared.

Walker's name, which was crossed out and American's name entered.

On March 12, 1968, Ideal received 1465 cartons and on March 14, 1968, Ideal received the one carton which had been retained for checking by customs.

Summarizing, all the documents involved in the transaction indicated American as the importer for its own account. Two documents had Walker's name crossed out: (1) The packing list, for obvious reasons; and (2) the Salkowitz bill of lading which is clearly a standard preprinted form generated by past Walker and Salkowitz dealings. Of course, it is equally correct that the designation of American on all these documents is based on information supplied by American officers. Financially, American's total cost of the Ideal shipment, excluding overhead, were:

| Cost of goods with charges by Bank of America | $15,710.78 |
|---|---|
| Duty, ocean shipping and forwarding | 4,637.94 |
| Insurance | 122.28 |
| Total | $20,471.00 |

### E.

Naturally, there was a controversy as to whether American or Commercial should be paid. Ideal did not pay American; rather, Ideal paid Commercial $24,000 against all outstanding invoices, pursuant to an indemnity agreement, whereby Commercial was to take over defense of this suit and hold Ideal harmless.

The amount which Ideal paid Commercial was explained by Mr. Haber and Mr. Pasternak of Ideal. Mr. Haber was Treasurer of Ideal at the time of trial and, although he had not joined Ideal until after the principal transactions involved herein had occurred, he had participated in subsequent settlement discussions. Mr. Pasternak was President of Ideal at the time of trial and was Executive Vice President at the time the transactions involved herein took place.

At the time Ideal paid Commercial, Ideal had specific debit memos, reflecting damaged or inferior good received from Walker, totalling $839.64. At trial, Ideal produced debit memos totalling $553.56; yet, there is unequivocal testimony that debit memos did exist which added up to the larger figure. The remaining $2,702.76 which was deducted from the invoice price for payment to Commercial represented Ideal's best estimate, at that time, of the value of shoes purchased from Walker (including the contract in question) which Ideal expected to be damaged and/or inferior.

Ideal did not demonstrate that either the $839.64, except perhaps for an insignificant amount, or the $2,702.76, related to the purchase orders on shoes delivered thereunder involved in this case. Moreover, although Mr. Pasternak testified that the $2,702.76 was a best estimate and reasonable approximation, no factual foundation was laid for that figure. Although Mr. Pasternak testified that there was normally a 3% return rate on higher quality merchandise than that involved in this case, no figure or estimate was introduced as to the gross numbers of shoes received from Walker to which this percentage can be applied by the Court. Moreover, Mr. Pasternak indicated that the reasonableness of the approximation could not be verified as a result of the fact that a practice was adopted of disposing of defective shoes at the retail level.

### III.

#### A.

This is, of course, an action based on diversity of citizenship over which we have jurisdiction. 28 U.S.C. § 1332.

Plaintiff's complaint in this action recites the delivery of the footwear to Ideal. However, it also incorporated allegations that, prior to delivery of the goods to Ideal, American had learned of the claim of Commercial, and had only delivered the goods in reliance on Ideal's promise to pay American. The testimony at trial, of course, belies this sequence of events and resulted in a motion to dismiss by the defendant, based

upon an asserted variance between plaintiff's evidence and plaintiff's complaint and pretrial order, which we denied. We concluded that the complaint and the final pretrial order in this case give fair and adequate notice of a straightforward claim based on goods sold and delivered, apart from reliance on the legal theory of promissory estoppel.

The threshold position of the plaintiff is that it sold and delivered goods to Ideal and is entitled to the amount due. The threshold position of Ideal is that, due to Commercial's prior valid and perfected security interest in all of Walker's present and future contract rights, accounts receivable, inventory, the goods evidenced thereby, and the proceeds thereof, Ideal properly paid Commercial the sum due for the footwear. The legal theories are further refined and raise several fine issues, principally involving Article 9 of the Uniform Commercial Code of New York.

First, plaintiff argues that, irrespective of the applicability of Article 9 or non-Article 9 law concerning successive assignments, an independent obligation arose on the part of Ideal to pay American for the goods.

Second, plaintiff argues that it was the assignee of a contract which required performance under section 9–104(f) and that such a transaction is excluded from Article 9 for all purposes. From this, plaintiff argues that priority between it and Commercial must be determined by New York common law which allegedly gives American priority.

Third, plaintiff has advanced several legal theories attacking defendant's asserted rights under Article 9 of the Code. First, plaintiff argues that a denial of summary judgment by a New York Court in an action by Commercial against American for declaratory, injunctive and monetary relief, involving apparently both the present transactions and others, establishes that Commercial had no security interest in the contract right when assigned for, at that time, it

was a liability in the hands of Walker. Secondly, plaintiff argues that the disposition of the contract right was authorized by Commercial's conduct and so its security interest was cut off. Thirdly, plaintiff argues that, even if the disposition was not authorized, once American performed under the contract, Commercial only had a right to an action against American for conversion.

This is only the general thrust of plaintiff's theories and, of course, defendant has responded to them all. As a federal district court, required to decide complicated state law issues, involving both New York and Pennsylvania, we proceed to resolve the dispute on what we hope are the narrowest and clearest state law grounds.

It is appropriate to note, preliminarily, that the parties have stipulated in the final pretrial order that Ideal paid Commercial under an indemnity agreement, whereby Commercial was to take over defense of this suit, and have further stipulated that Commercial has, in fact, taken over defense of this suit. Despite objections at trial, the Court admitted these stipulated facts into evidence and incorporates them as findings of fact. *Leizerowski v. Eastern Freightways, Inc.*, 514 F.2d 487 (3d Cir., 1975). Defendant has asserted, and since plaintiff has not contested the assertion, we accept it, that it may, in defense of this suit, raise the same rights against American that Commercial could raise against American in a suit by American against Commercial arising from the transactions involved herein.

B.

Plaintiff has argued that an independent obligation arose on the part of Ideal to pay it for the goods delivered. It would seem that, even if so, Ideal would be entitled to a charge back and also possibly a deduction for any conversion damages which Commercial could claim from these transactions.

At any rate, however, it is clear on the evidence that American acted at all relevant times as an assignee.

The Baccash-Volpe telephone conversation is of no assistance to American. First, it is clear that Miss Volpe had no authority with respect to contractual obligations, and American would not have justifiably relied on any representations by her. Second, although there is some evidence that the Commercial telegram of February 14 had passed through Miss Volpe's hands before her conversation with Baccash on February 19, there is no evidence that Miss Volpe connected the telegram with the conversation and we believe it quite likely that she did not. Miss Volpe's remark, at most, reflects her experience with the fact that companies, other than those to whom orders are sent, sometimes perform those orders.

Plaintiff's own evidence demonstrates quite conclusively that it acted throughout purely pursuant to its assignment, and that American so perceived the situation. Baccash's version of the telephone conversation is completely consistent with this conclusion. The only significant challenge to this conclusion is raised by Ideal which asserts that American was a mere money-lender. We explore and reject this suggestion in the next section of the memorandum.

Notwithstanding the fact that American never refused to deliver after learning of Commercial's claim, and Ideal never promised to pay American to obtain delivery in response to such a refusal, plaintiff argues that an independent obligation exists. Plaintiff, however, has neither cited authority nor otherwise raised this theory from the realm of the obscure. Consequently, we conclude that American's rights are limited to those due to it as a performing assignee, and so Ideal bears no duty to American independent of duties running from Ideal to American arising from the performance of the assignment [7].

## C.

We must fully explore the nature of the interest of American in the contract right, in light of defendant's contention that the transaction between American and Walker created a security interest; so that American, like Commercial, was a secured party. Ideal contends, and plaintiff does not contest, that as between Commercial and American, as secured parties, Commercial had priority and so Ideal is not liable to American.

Section 9–102 [8], defining the policy and scope of Article 9, pertinently reads as follows:

(1) Except as otherwise provided in Section 9—103 on multiple state

7. As a federal court in a diversity case, we must apply state law to resolve the merits of the controversy, and we apply the conflict law of the state in which this Court sits to determine which state's law applies to the merits. *Klaxon Co. v. Stentor Elevator Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941); *Neville Chemical Company v. Union Carbide Corporation*, 422 F.2d 1205 (3d Cir. 1970), *cert. den.*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). The Pennsylvania Supreme Court follows the modern approach and looks to the law of the place with the most significant relationship to the parties and the transaction, on each issue, or the 'center of gravity' of the contract. *Neville Chemical Company v. Union Carbide Corporation, supra*; *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

The parties agree that the nature of the interest and rights thereunder which Com-

mercial and American received on the assignments from Walker are governed by New York law. 12A P.S. § 9–103(1) (1970). With respect to whether an independent obligation arose on behalf of Ideal to American, apart from rights and duties under the assignment, defendant seems to argue that Pennsylvania law applies. We perceive no difference in result between the two. With respect to plaintiff's right to interest and the rate thereof, we believe that, under the facts of this case, an interest analysis points to New York law.

8. All references are to the 1962 Official Text of the Uniform Commercial Code. The New York version of all sections referred to are identical with those of the 1962 Official Text. See, N.Y. Uniform Commercial Code (McKinney, Vol. 62½ (1964)).

transactions and in Section 9—104 on excluded transactions, this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this State

> (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and also
>
> (b) to any sale of accounts, contract rights or chattel paper.

The official comment to this section in pertinent part, states:

> "The purpose of this Section is to bring all consensual security interests in personal property and fixtures, with the exception of certain types of transactions excluded by Sections 9—103 and 9—104, under this Article, as well as sales of accounts, contract rights and chattel paper whether intended for security or not unless excluded by Section 9—104(f) . . .
>
> "1. Except for sales of accounts, contract rights and chattel paper, the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security?"

As defined in Section 1–201(37):

> " 'Security Interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . The term also includes any interest of a buyer of accounts, chattel paper, and contract rights which is subject to Article 9."

There is a relevant "otherwise provided" in subsection (f) of Section 9–104, "Transactions Excluded From Article", which provides:

> *"This Article does not apply*
>
> . . . . . . .
>
> *to* a sale of accounts, contract rights or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts,

contract rights or chattel paper which is for the purpose of collection only, or *a transfer of a contract right to an assignee who is also to do the performance under the contract ;* . . ." (Emphasis Added)

The official comment to this section, number 6, provides:

> "In general sales as well as security transfers of accounts, contract rights and chattel paper are within the Article (see Section 9–102). Paragraph (f) excludes from the Article certain transfers of such intangibles which, by their nature, have nothing to do with commercial financing transactions."

Defendant has not contended that the type of contract right involved here could not come within § 9–104(f). Rather, defendant argues that, in reality, American simply financed the purchase of goods for resale by Walker, and that being the case, American only has a security interest. The plaintiff's claim that it took over the contract and performed it, itself, is characterized as a camouflage for a security transaction.

■ We do not doubt that a transaction, whereby a security interest is intended to be created, but is disguised as a § 9–104(f) assignment, gives rise, in fact and law, to a security interest, rather than a § 9–104(f) assignment.

In situations where the performance under the contract is principally service the distinction is not difficult because the objective differences are obvious. However, in situations such as that presented here where performance under the contract involves principally an outlay of money with ancillary rendition of service, the objective differences necessarily are less than obvious.

■ We have concluded that the transaction between American and Walker was an assignment of the Ideal contract right to Ideal by Walker. It is obvious, once we have reached that conclusion, that American was to do the

performance under the contract, and so that this is an assignment within the meaning of § 9–104(f).

We believe that American's action in the transaction and its treatment of the goods, set out in detail above, are supportive of our conclusion; notwithstanding defendant's assertion that many of their actions were motivated by a desire to cover their tracks.

Also relevant, of course, is the testimony of Messrs. Baccash, Connelly, Fleming, Fisher and Lynn regarding what was said during negotiations and at the meeting of December 18. We have set forth, in detail, our findings of fact in this regard. In doing so, we credited and relied upon the testimony of Messrs. Baccash, Connelly, and Fleming. Nonetheless, these matters were hotly contested. Mr. Fisher's testimony regarding the events leading to the connection of Walker and American is similar to what we have found in terms of the chronology of events. However, Fisher also testified that, from the original meeting with Fleming in the Marbridge Building, both he and Lynn informed Fleming, Baccash and Connelly that Walker was interested in financing its purchase orders because Walker's past and present factor had refused to take out letters of credit to cover existing orders that Walker had. Specifically, Fisher testified that both he and Lynn told the American people: that Commercial factored Walker but had refused to take out letters of credit on several important orders; that Walker wanted American to finance these orders because Lynn was afraid he would lose the goodwill of the customers; that, as a result, there would be problems but that American could arrange the transaction in whatever way it wished, for Lynn was desperate. William Lynn also testified on these matters, although in a rather confused manner. Although Lynn essentially testified that his conversations with the American personnel were directed at becoming a sales agent, his testimony is corroborative of that of

Fisher with respect to American people being told of the relationship between Walker and Commercial.

This testimony is relevant to a number of theories advanced by the parties and, at this point, is relevant in that knowledge or lack thereof by American of Commercial may be probative of American's intent in regard to the transaction with Walker.

We credit the testimony of Baccash, Connelly, and Fleming both because we found them more credible witnesses and because their testimony appears more fully consistent with the circumstances.

The interest of the American personnel in their testimony is obvious. However, there are, in addition, factors and internal circumstances which reflect adversely on the testimony of Lynn and Fisher. Lynn's testimony with respect to the financial arrangement and course of business between Walker and Commercial was both vague and vacillating. Notwithstanding the fact that Reicher and Patrusky may have handled most of the financial details for Walker, in connection with the arrangement with Commercial; in light of Lynn's extensive experience in this area of business, both before and after the time period involved herein, and the fact that Lynn's testimony was no more forthright with regard to activities in which he was indisputably directly involved, we must conclude that Lynn's testimony, in general, was less than candid. The following factors are also relevant to assessing the credibility of Lynn and Fisher. It is worthy of note that Lynn, along with Reicher and one, Buddy Franz, guaranteed the indebtedness of Walker to Commercial. Commercial has made no personal demand on Lynn. The existing indebtedness is very substantial. In addition, Lynn, upon a plea of guilty, was convicted in 1964 of the importation of merchandise into the United States by means of fraudulent and false invoices, declarations and affidavits. Fisher is a personal friend of Lynn and Lynn intended to financially reward Fisher for

his effort in the American deal. In addition, in 1968, Lynn formed a corporation by the name of Walker International Corporation to attempt to do business since, by that time, neither American nor Commercial would deal with Walker. Fisher was vice-president and a shareholder (allegedly a straw party) in this corporation.

Moreover, we find the plaintiff's version of the facts on these matters much more plausible in the business context that existed at that time. We find it very difficult to believe that American would knowingly enter into a situation which would necessarily lead to a battle with a factor; and we find it incredible that Lynn and Fisher, with their experience, would reveal this information at a time when Walker and Lynn were attempting to escape from between a rock and a hard place.

For all these reasons, we conclude that American was a section 9–104(f) assignee.

### D.

Plaintiff has asserted two theories which avoid the question of priority and which, if successful, would result in a cut off of Commercial's security interest, and as a consequence, American would be entitled to the invoice price minus only an amount for charge back.

### 1.

As noted above, Commercial instituted, in New York Courts, an action which is related to the instant case. In that action, Commercial moved for summary judgment. On January 26, 1973, the New York Supreme Court denied Commercial's motion stating:

"Upon the foregoing papers this motion by plaintiff for summary judgment is denied. The motion is made on the eve of trial more than four years after the commencement of the action.

There are at least two crucial factual issues which require a trial. They are whether the alleged rider to the agreement between plaintiff and a third party, Walker Trading Company Inc. was in existence at the time that the agreement was entered into. The other is whether Walker's alleged contract rights, which were allegedly appropriated by defendant, were rights having any value whatever or whether they were merely liabilities of Walker at the time defendant appeared on the scene."

This denial of summary judgment was affirmed by the five-man Appellate Division without opinion on April 23, 1973.[9]

Plaintiff has argued that Commercial cannot have a security interest in a liability, and that the contract right at issue here was a liability, and so Commercial had no security interest in this contract right. Moreover, plaintiff argues that this New York decision establishes the law of the case in this action in that Commercial is the "real defendant" herein. Defendant vigorously opposes these premises and deductions.

We need not enter the legal fray engendered by plaintiff's theory, notwithstanding the fact that we have serious doubts concerning plaintiff's analysis of the impact of the New York summary judgment decision both in that case and in this case. We can assume, for purposes of disposing of these arguments, that Commercial could have no security interest in a liability and that this principle is established as the law of the case. Plaintiff has not suggested, nor could it, that the New York decision established, as a fact, the contract right was a liability.

Plaintiff asserts that Commercial must prove that Lynn could have come up with the margin which Commercial required. It also notes, as relevant in

---

9. The action in this Court was filed subsequent to the New York Action. Another judge of this Court denied Ideal's motion to stay proceedings herein. The New York action has not yet gone to trial.

this regard, that some of the purchase orders were already overdue in December.

First, it is not at all clear that the New York Court's decision, as interpreted by plaintiff, may not have relied on evidentiary matters totally absent from the record before us. The record of that action is not before us. Second, plaintiff cites no authority for placing the burden of proof upon defendant, nor does it cite any authority or in any way explain why that burden should be defined as it has.

 At any rate, the evidence does not show the purchase orders were a liability. Despite the fact that certain orders were overdue, Ideal accepted performance thereunder. Moreover, Grossman offered assistance to Lynn in locating secondary financing, and yet Lynn never accepted the invitation. Any contract right is a potential liability and the plaintiff should, in this context, bear the burden, at trial, of proving that a particular contract right is, in fact, a liability.

### 2.

Section 9–306 is relevant to plaintiff's contention that Commercial authorized the disposition of the contract right by Walker, and provides, pertinently in subsection (2), as follows:

"[A] security interest continues in collateral [the property subject to the security interest] notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collection received by the debtor."

The official comment to 9–306 (number 3) provides, as pertinent:

"In many cases a purchaser or other transferee of collateral will take free of a security interest: in such cases the secured party's only right will be to proceeds. The transferee will take free whenever the disposition was authorized; the authorization may be contained in the security agreement or otherwise given. A claim to proceeds in a filed financing statement might be considered as impliedly authorizing the sale or other disposition of the collateral, depending upon the circumstances of the parties, the nature of the collateral, the course of dealing of the parties and the usage of trade."

 An authorization to sell contract right collateral cannot be premised on the security agreement, itself. As set out in footnote 2, *supra,* paragraph one of the agreement provides, in part:

"During the term of this agreement, the Customer shall not sell, pledge, assign or otherwise encumber or dispose of any of its accounts to, or borrow any money thereon from, any party other than the Company."

We have examined the cases cited by the plaintiff and others in support of its theory of implied authorization. See, e. g., *Central Washington Production Credit Ass'n v. Baker,* 11 Wash.App. 17, 521 P.2d 226 (1974); *Planters Production Credit Association v. Bowles,* 256 Ark. 1063, 511 S.W.2d 645 (1974); *South Omaha Production Credit Association v. Tyson's Inc.,* 189 Neb. 702, 204 N.W.2d 806 (1973); *Farmers State Bank v. Edison Non-Stock Cooperative Assn.,* 190 Neb. 789, 212 N.W.2d 625 (1973); *Baker Production Credit Ass'n v. Long Creek Meat Co., Inc.,* 266 Or. 643, 513 P.2d 1129 (1973); *Lisbon Bank & Trust Co., v. Murray, Meier,* 206 N.W.2d 96 (Iowa, 1973); *McFadden v. Mercantile-Safe Deposit and Trust Co.,* 260 Md. 601, 273 A.2d 198 (1971); *Clovis National Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967).

Indeed, we note that there is indication that the courts of New York will be receptive to the implied authorization concept. *Long Island Trust Co. v. Porta Aluminum Corp.,* 44 A.D.2d 118, 124–26, 354 N.Y.S.2d 134, 141–42 (1974); *Hempstead Bank v. Andy's Car Rental*

*System, Inc.*, 35 A.D.2d 35, 39–40, 312 N.Y.S.2d 317, 321–22 (1970).

Plaintiff concedes, as he must, that there is no course of dealing between Walker and Commercial from which an implied authorization for Walker to dispose of the contract right may be inferred. Rather, plaintiff argues that an implied authorization existed by reason of the fact that the contract was a liability to Walker. Specifically, plaintiff argues that, by dint of the position taken by Commercial on Walker's request for a letter of credit, Walker had no choice but to go elsewhere lest Walker face a large liability and go out of business. Further plaintiff argues that Walker would exercise the only reasonable option and go elsewhere with the orders. From this, plaintiff argues that this must give rise to a conclusion of authorization for "[to] find otherwise is to say Commercial could prevent Walker from remaining in business despite Commercial's decision to end its financing."

■ This argument is more properly categorized under principles of estoppel and good faith. We note that principles of estoppel are applicable to Article 9 transactions, section 1–103[10], and that every contract under the Uniform Commercial Code, including a contract under Article 9, imposes an obligation of good faith in its performance or enforcement. Section 1–203.[11]

■ However, the evidence in this case, does not support a finding that Commercial had decided to stop financing Walker and to effectively put it out of business. Although Commercial insisted upon a high margin on the orders at issue, such a request appears justified under the circumstances then existing.

Of course, plaintiff argues those same circumstances made it impossible for Walker to produce the requested margin. However, it is undisputed that Lynn, for Walker, did not pursue Grossman's offer of help in locating secondary financing. We cannot presume, as we would have to, as there is no evidence, that such an arrangement could not have been worked out or that such an arrangement was unreasonable or lacking in good faith in this business context.

We realize that at the time of trial Lynn was no longer in business for himself but rather was a salesman for an importing firm. We also realize that, sometime in 1968, Lynn formed a corporation, Walker International Trading Corporation, to enable himself to do business because he no longer could do business with American or Commercial. Lynn also testified that, in the summer of 1967, Walker had at least some orders cancelled by customers because Walker could not deliver and its inability to deliver was occasioned by its inability to obtain letters of credit. Notwithstanding these facts which tend to support plaintiff's theory, based upon our assessment of Lynn's behavior throughout these transactions and the facts set out above, we cannot make the leap, required on this record, to the conclusion that Commercial forced Lynn out of business and/or acted in a commercially unreasonable manner. In addition to the fact that Lynn ignored Grossman's offer of assistance in securing secondary financing, the record is clear that Commercial honored overdrafts on existing letters of credit by Walker, as late as the fall of 1967; and the record is confused as to whether Commercial opened letters of credit for Walker, as late as December 1967.

---

10. Section 1–103. Supplementary General Principles of Law Applicable.

 Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

11. Section 1–203. Obligation of Good Faith.

 Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement.

Consequently, we reject this theory of the plaintiff.

### E.

The consideration of the remaining legal theories presented necessitates a more detailed analysis of the interest of Commercial.

■ It is clear that Commercial had a perfected security interest in the contract, represented by the Ideal purchase orders. Although plaintiff has never abandoned its contention that Commercial independently attached the rider to the basic document, subsequent to the signing thereof, the uncontradicted testimony establishes that the rider was attached to the document when it was signed and is part of the Walker-Commercial agreement.[12]

■ The agreement between Walker and Commercial is a classic security arrangement. *See,* Sections 9–102(1)(b) and 1–201(37). The security interest of Commercial is enforceable because there is an adequate description of the collateral. Section 9–203(1)(b).[13] Moreover, the security interest in the contract right at issue had attached long before the assignment thereof to American for there was an agreement that it attach, value had been given, and the debtor had rights in the collateral. Section 9–204.[14] Walker received the purchase orders from Ideal on July 22, 1967, and the assignment to American took place on December 18, 1967. The interest of Commercial as of July 22, 1967 was enforceable not only against the debtor, Walker, but also against both purchasers of the collateral and creditors. Section 9–201.[15] Also Commercial's security interest was perfected by filing. Section 9–302.[16]

Defendant has also asserted that Commercial had a security interest in the Walker-Fu Yong contract, under which Fu Yong manufactured the footwear pursuant to Walker's order. Further, defendant argues this interest entitled Commercial to be paid the price of the goods when delivered to Ideal by American.

■ However, we do not believe that Commercial had a security interest in the Walker-Fu Yong contract, in the first instance.

---

12. The significance of plaintiff's contention is that, if accepted, Commercial had no interest in the contract right at issue; for, the basic document literally only grants Commercial an interest in a contract right that it specifically purchases and no such specific purchase or financing of the contract right at issue occurred.

The contention regarding the time of attachment of the rider to the basic document is the only attack plaintiff has made on the security interest of Commercial in the contract right. Reading the basic document and the rider together, we conclude that Commercial had a security interest in the contract right, despite the fact that it had not specifically purchased or financed it. We note that the mere attachment of the rider to the basic document, which was drafted to conform the demands of another day, was poor craftsmanship, resulting in a remarkably sloppy agreement. In addition to our reluctance to raise an interpretative issue on our own at this date, we believe the clear intent of the parties, as reflected by the terms of the rider, was to supersede the specific purchase requirement in the basic document.

13. § 9—203. Enforceability of Security Interest; Proceeds, Formal Requisites.

(1) . . . a security interest is not enforceable against the debtor of third parties unless

. . . . .

(b) the debtor has signed a security agreement which contains a description of the collateral . . . In describing collateral, the word 'proceeds' is sufficient without further description to cover proceeds of any character.

14. See page 164 *infra.*

15. § 9—201. General Validity of Security Agreement.

Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors.

16. Section 9–302 provides that a financing statement must be filed to perfect all security, with certain specific exceptions. Commercial had perfected by filing in this case so there is no need to discuss the exceptions.

Section 9–106 of the Code sets out certain pertinent definitions:

" 'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper. 'Contract right' means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper. 'General intangibles' means any personal property (including things in action) other than goods, accounts, contract rights, chattel papers, documents and instruments."

The official comment states pertinently:

"The term 'general intangibles' brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance."

We do not rely on the fact that the rider, itself, does not refer to general intangibles, and the additional fact that the Walker-Fu Yong contract was clearly a general intangible. For, even reading paragraph one of the basic document, the rider, and the relevant financing statement both cumulatively and without an acceptance and purchase requirement, the Walker-Fu Yong contract is covered neither by use of Article 9 terminology nor words generally descriptive of the contract of this nature.[17]

## F.

### 1.

Plaintiff argues that the priority provisions of Article 9 do not apply between Commercial, as an Article 9 secured party, and American, as a section 9–104(f) performing assignee. It argues that the common law of New York controls to determine priority. This is a difficult question of interpretation which we need not resolve.[18] Even assuming plaintiff

17. We do not believe that the Walker-Commercial inventory security agreement furthers Ideal's position. Dated December 30, 1966, this agreement pertinently provides, in paragraph one:

"We [Walker] hereby grant a continuing Security Interest in your favor upon all of our present and hereafter-acquired Inventory, and the products and proceeds thereof. The term 'Inventory' includes all our present raw materials, components, work in process, finished merchandise, and packing and shipping materials, wherever located; and all chattels hereafter acquired by us by way of substitution, replacement, return, repossession or otherwise; and all additions and accessions thereto, and the resulting product or mass; and any documents of title representing any thereof."

It is clear that neither the footwear nor the footwear in process ever belonged to Walker for Walker never paid for it and so, under the terms of the agreement, was not the inventory of Walker. A fortiori, Walker had no document of title covering the footwear, as Walker inventory, as there was no such inventory. This renders irrelevant the packing list which once contained Walker's name, even assuming it, otherwise was a document of title.

Moreover, we do not believe that this agreement alters our conclusion that Commercial had no security interest in the Walker-Fu Yong contract. The inventory agreement is concerned with a totally distinct type of collateral-tangible property of Walker and documents controlling that property.

18. The parties have cited a number of cases on this issue which we need not review since we do not resolve the issue. We need not resolve the issue because it is clear that, if the Article 9 priority provisions apply, Commercial's interest in the contract right is superior to that of American. In light of the fact that we find Commercial's interest superior to that of American, on a different theory, there would be no difference in the outcome of the case, occasioned by our resolving this issue. We believe that the legal theory on which we rely is clearer than any answer we could reach on the issue regarding the meaning of 9–104(f). Since we interpret New York law, we believe it appropriate to resolve the case on the clearer of the alternative grounds.

Plaintiff's theory, on this issue, primarily rests upon the introductory exclusionary language of section 9–104(f), while the contrary position of the defendant is principally grounded on section 9–301(1)(d).

is correct that priority should be determined by application of common law, we find Commercial's interest in the contract right superior to that of American.

In this area of common law priority, plaintiff argues, as follows:

"New York law is clear that where a party has acquired contract rights *and* the obligation to perform thereunder, the party's rights to payment for performing under the contract are superior to a prior security interest in the 'contract rights'."

Plaintiff further argues that:

"A security interest in future contract rights gives the lien creditor an equitable interest which is defeated by the subsequent assignment of the contract to a party with the duty to perform, which assignment creates a legal interest."

"In determining disputes such as ours, between the assignee of future contract rights (who has an equitable interest) and a party which has acquired a legal interest, i. e., the assignee of contract rights with a duty to perform, the Courts have repeatedly held that it is the holder of legal rights who prevails."

We have perused the cases relied upon by the plaintiff, in support of this series of propositions set forth above, and discovered that none relate to a situation concerning a performing assignee of a contract right.[19] We, however, do not need to journey deeply into this esoteric area of New York common law, and may assume the correctness of plaintiff's position on New York common law which has at least some support in the New York decisions to which our attention has been directed.

■■■■■■ An assignee of a contract right which did not yet exist, since the contract, itself, did not yet exist, would receive an equitable interest. An assignee of rights under a contract, which existed at the time of the contract, would receive a legal interest. We may concede, as does the defendant, that an assignee of an existing contract (legal interest) is generally superior to a prior assignee of the same contract, which contract came into existence subsequent in time to the prior assignment thereof (equitable interest).[20] Moreover, we may assume to be correct plaintiff's further contention, although the defendant asserts the contrary, that, at common law, the sheer coming into existence of a previously assigned contract right does not change that assignee's interest from an equitable to a legal one, i. e. plaintiff argues that some further act of transfer to that assignee by the assignor is necessary to transform that assignee's interest from an equitable to a legal one.[21] Finally, we may assume to be correct plaintiff's final contention, although defendant again asserts the contrary, that the fact that the assignee of the legal interest had notice, at the time of its assignment, of the prior equitable as-

19. The cases relied upon by the plaintiff are cited here. *City of New York v. Bedford Bar & Grill, Inc.*, 2 N.Y.2d 429, 161 N.Y.S. 2d 67, 141 N.E.2d 575 (1957); *Titusville Iron Co. v. New York*, 207 N.Y. 203, 100 N. E. 806 (1912); *Zartman v. First National Bank*, 189 N.Y. 267, 82 N.E. 127 (1907); *New York Security and Trust Co. v. Saratoga Gas and Electric Co.*, 159 N.Y. 137, 53 N.E. 758 (1899); *Rochester Distilling Co. v. Rasey*, 142 N.Y. 570, 37 N.E. 632 (1894); *State Factors Corporation v. Sales Factors Corporation*, 257 App.Div. 101, 12 N.Y.S.2d 12 (1939); *Glass v. Springfield L.I. Cemetery Society*, 252 App.Div. 319, 299 N.Y.S. 244, *leave to appeal denied*, 276 N.Y. 687

(1937); *City of Utica v. Gold Metal Packing Corp.*, 54 Misc.2d 708, 283 N.Y.S.2d 611 (Sup.Ct.1967); *Aponte v. Maritime Overseas Corporation*, 300 F.Supp. 1075 (S.D.N. Y.1969).

20. See the cases cited in footnote 19.

21. *Compare, e. g., State Factors Corporation v. Sales Factors Corporation, supra*, 257 App.Div. at 103, 12 N.Y.S.2d at 14 *with Fairbanks v. Sargent*, 117 N.Y. 320, 335–38, 22 N.E. 1039, 1042–43 (1889); *Williams v. Ingersoll*, 89 N.Y. 508, 519 (1882); *Goldwater v. Nitzberg*, 161 Misc. 847, 848–49, 292 N.Y. S. 119, 120 (Mun.Ct. of New York City, 1936).

signment, is irrelevant to the priority question.[22]

■ Significantly, plaintiff's argument concedes the undisputed New York common law priority rule that, as between two assignments, of the same nature, either equitable or legal, the assignee, prior in time, is superior. *See, e. g., Superior Brassiere Co., Inc. v. Zimetbaum,* 214 App.Div. 525, 526–27, 212 N.Y.S. 473, 475 (1925); 3 N.Y. Jurisprudence, *Assignments* § 66 (1970).

Applying these principles to the facts of this case, plaintiff might prevail because: the assignment to Commercial took place prior to July 22, 1967, when Walker received the purchase orders from Ideal; arguably no further act was performed by Walker so that Commercial's interest remained an equitable one; and the assignment to American in December, 1967 created a legal interest in American superior to the equitable interest of Commercial.

■ However, even assuming as we have that the plaintiff's interpretation of New York common law is correct in all respects, we believe that Article 9 mandates the conclusion that the interest of Commercial in the contract, as of July 22, 1967, was a legal one, and changes prior New York common law, at least to that extent. When we then apply the undisputed rule of priority between assignments, both of a legal stature, Commercial's has priority in the contract right.

We draw our conclusion that Commercial's interest is a legal one from section 9–204, which reads, pertinently, as follows:

(1) A security interest cannot attach until there is agreement (subsection (3) of Section 1—201) that it attach and value and is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

(2) For purposes of this section the debtor has no rights.

· · · · · ·

(c) in a contract right until the contract has been made;

· · · · · ·

(d) in an account until it comes into existence.

(3) . . . a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement.

The comment to 9–204 reads, in pertinent part, as follows:

1. Subsection (1) . . . states a rule of construction under which the security interest, unless postponed by explicit agreement, attaches automatically when the three stated events have occurred.

2. Subsections (1) and (3) read together make clear that a security interest arising by virtue of an after-acquired property clause has equal status with a security interest in collateral in which the debtor has rights at the time value is given under the security agreement. . . . That is to say: the security interest in after-acquired property is not merely an 'equitable' interest; no further action by the secured party—such as the taking of a supplemental agreement covering the new collateral—is required.

· · · · · ·

4. Subsection (2) states the time at which debtor has rights in collateral in specified cases. A security agreement may be executed and value given before the debtor acquires rights: the security interest will then attach under subsection (1), as to after-acquired property, when he does. Subsection (2) states when that is in several controversial cases. Notice that the vexed question of assignment of future accounts is treated like any

---

22. *Compare, e. g., City of Utica v. Gold Metal Packing Corp., supra,* with *State Factors* *Corporation v. Sales Factors Corporation, supra.*

other case of after-acquired property: no periodic list of accounts is required by this Act."

Also of specific relevance is the following observation in the official Comment to Section 9–106.

"It has been found advisable to distinguish rights earned from rights not yet earned for several reasons. The recognition of the 'contract right' as collateral in a security transaction makes clear that this Article rejects any lingering common law notion that only rights already earned can be assigned."

The cases on which plaintiff relies are based on the pre-Article 9 after-acquired property concept which has been specifically interred by section 9–204.

▆▆▆ Although plaintiff may make a reasonable argument that Article 9 priority provisions do not apply to a situation, such as this, involving a section 9–104(f) assignee, it cannot conceivably argue that the nature of an interest granted to a secured party, by section 9–204, is changed thereby.

Consequently, since the legal interest of Commercial is prior in time to the assignment to American, Commercial's interest in the contract right is superior, under New York common law priority rules.

### 2.

We must now consider the significance to the transactions of the fact that Commercial had a superior interest in the contract right which American performed.

Defendant argues from this point that Commercial's security interest follows the contract right into the account generated by American's performance, and the monies due thereunder. Commercial's rights are, of course, defined by Article 9. We agree with the plaintiff that defendant's security interest is not quite so versatile.

Section 9–306(1) defines the important concept of proceeds, as follows:

" 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds'. All other proceeds are 'non-cash proceeds'."

As noted previously, 9–306(2) provides "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor", and "also continues in any identifiable proceeds including collections received by the debtor."

That part of the official comment relevant to our present problem reads, as follows:

"Purposes of Changes:

1. To state a secured party's right to the proceeds received by a debtor on disposition of collateral . . .

2. Changes from Prior Law:

(a) Whether a debtor's sale of collateral was authorized or unauthorized, prior law generally gave the secured party a claim to the proceeds . . . [w]hatever the formulation of the rule, the secured party, if he could trace the proceeds, could reclaim them or their equivalent from the debtor or his trustee in bankruptcy. The change in existing law made by this Section relates to non-identifiable cash proceeds . . .

3. In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion. Subsection (2) codifies this rule. The secured party may claim both proceeds and collateral, but may of course have only one satisfaction."

Against this background of section 9–306, we can specifically set out the arguments of the parties. First, plaintiff argues that the account and money due thereunder are not the proceeds of the contract right for the account was created by American's performance of the contract and Commercial only had a security agreement with Walker. Second, plaintiff, relying on the official comment, set out above, argues that, in the case of an unauthorized disposition, the secured party · may only repossess the collateral or sue for conversion. Defendant maintains that Commercial had a prior valid and perfected security interest in all of Walker's present and future contract rights and the proceeds arising therefrom and so, that Ideal properly paid Commercial the proceeds of the sale of the footwear in dispute [23].

Although neither party has raised the issue, we assume that Ideal's authority for paying Commercial for the goods arises from paragraph five of the basic document granting Commercial authority to collect accounts, and section 9–502(1), which provides:

> "When so agreed and in any event on default the secured party is entitled to notify an account debtor or the obligor on an instrument to make payment to him whether or not the assignor was theretofore making collections on the collateral, and also to take control of any proceeds to which he is entitled under Section 9—306."

We agree then that the parties have correctly framed the issue as to whether or not the account generated by American's performance of the Walker-Ideal contract is a proceed of that contract within the meaning of 9–306. We hold that it is not and that Commercial only had a claim against American for conversion.

Neither party has directed the Court's attention to any authority on the meaning of proceeds in 9–306, in a factual context such as that presented here.

23. We should note that, although the issue has not been raised by either party, neither the basic document nor the rider thereto makes mention of proceeds. Although the inventory security agreement covers proceeds of the items covered by that agreement, that agreement is irrelevant to the present problem. We only advert to this issue now so that our views will be on the record in the eventuality that a reviewing court may raise a question in this regard.

Generally, of course, in order for a secured party to receive a security interest in proceeds, such an interest must be granted in the security agreement. Section 9–203(1)(b). However, the proceeds box of the relevant financing statement in this case is checked and this statement is signed by representatives of both Walker and Commercial. Although there is some conflict in authority with respect to this question, we believe the New York Courts, under these circumstances, would conclude that Commercial received a security interest in the proceeds of the Walker contract rights, as part of the parties' "bargain . . . in fact". Sections 9–204(1) and 1–201(3). *Compare, In Re Marta Cooperative, Inc.*, 74 Misc.2d 612, 344 N.Y.S.2d 676 (Nassau County Court, 1973). Moreover, even if we thought otherwise, neither this Court, after trial, *sua sponte*, nor the plaintiff, should rely on this issue, since it was not raised by the parties.

The potential significance of this issue is, of course, that absent a security interest in proceeds, Commercial had no security interest in the account generated by American's performance of the contract right. Thus, Ideal improperly paid Commercial. We think it clear that regardless of the merits of our resolution of the meaning of the word "proceeds" in 9–306, in the text, *infra*, the accounts referred to in the security agreement, itself, refer only to accounts generated by Walker and not by the performance of a third party.

However, even if we should raise the issue *sua sponte*, we do not believe it would change the result in the case either way it was resolved. Our opinion assumes that Commercial has a security interest in proceeds, as we interpret that term under the Code, and yet, for the reasons set out in the text, we limit Commercial to a conversion claim against American. Even if we were to conclude that Commercial had no security interest in proceeds under the Code, Commercial would have a conversion claim against American for conversion of the contract right, itself, in which Commercial indisputably had a security interest. Thus, in our view, however the issue is analyzed, the outcome remains the same.

The threshold question is whether proceeds in 9–306 includes that which is received by a third-party when that third-party disposes of collateral, and not the debtor. Specifically here, we deal with the question of whether a secured party's security interest in a contract right transfers into the account (as a proceed of the contract right) generated by the performance of the underlying contract, not by the debtor, but by a third-party. Section 9–306, on its face, is not free of ambiguity on this question.

We are aware that some cases have used broad language in suggesting that the proceeds of collateral in 9–306 may include proceeds received on disposition of the collateral by a third-party, other than the debtor. Perhaps the broadest statement in this regard is by the court in *Farnum v. C. J. Merrill, Inc.*, 264 A.2d 150, 156 (Maine Supreme Court, 1970). However, when read in light of its facts, *Farnum* is not strong authority in the context of this case. *Farnum* dealt with a controversy regarding the unpaid contract price due for a custom built dryer which had been sold by the debtor and in which a bank had a security interest. The debtor had gone into receivership and the court held that monies received by the receiver in payment for the dryer were proceeds in which there was a security interest in favor of the bank, as a secured party. The case specifically relied upon, by the court in *Farnum*, is also distinguishable. *Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc. (No. 3)*, 25 Pa.D. & C.2d 395 (Pa.C.P., Phila.Cty.1958).

Moreover, there is authority for plaintiff's position. In *Beneficial Finance Co. v. Colonial Trading Co.*, 43 Pa.D. & C.2d 131 (Pa.C.P., York County, 1967), the Court stated, in a case involving the sale after purchase, by a third party, of household furnishings, in which was a security interest, that:

"We hold, therefore, that under the Uniform Commercial Code, where a debtor sells collateral subject to a perfected security agreement, the secured party may proceed (1) against the debtor (a) to collect the debt on the original instrument, or (b) to assert his rights under the security agreement against any identifiable proceeds *in the hands of the* debtor, or (2) against the purchaser (a) by repossession of the purchased goods in person or by an action in replevin, or (b) by an action *in trespass for conversion of the collateral*. However, once the purchaser has himself resold the goods, the secured party has no right of action *in assumpsit* against the *purchaser*, either for the original debt or for the proceeds of the resale." *Beneficial Finance Co. v. Colonial Trading Co., supra* at 132.

 Although we conclude that Commercial did not have a security interest in the account, generated by American's performance of the contract, as a proceed of the contract right in which Commercial had a security interest, we do so on narrower grounds than those set out above. Essentially, we accept the first argument of the plaintiff in this regard, set out above. We believe that there must be a reasonable relationship between the collateral and what is considered a proceed thereof under 9–306. In the case of tangible goods, there is little difficulty. However, in the case of an unperformed contract, the account generated by performance is more the result of the performance than the product of the contract, itself. An element of service is, of course, present in a disposition of all collateral but there is a substantial variance in degree. We recognize that 9–306(1), itself, clearly states that the word proceeds includes "the account arising when the right to payment is earned under a contract right". *Compare, United States v. Samel Refining* Corporation, 313 F.Supp. 684, 687 (E.D. Pa.1970), *aff'd*, 461 F.2d 941 (3d Cir. 1972). We conclude, however, that, at

least with regard to contract right collateral, a proper interpretation of 9–306 limits proceeds, in the case of performance of the contract, to situations where the proceeds are received by the debtor upon the debtor's performance of the contract [24].

Thus, in this situation, Commercial was limited to a conversion claim against American and so Ideal is liable to American for the goods sold and delivered.

## G.

### 1.

 As noted above, plaintiff does not oppose defendant's proposition that it may offset, against plaintiff's recovery, the value of Commercial's conversion claim. Moreover, aside from the contentions previously resolved against plaintiff, plaintiff does not contest the fact that an actionable conversion took place.

Plaintiff argues that, as an innocent converter, it is only liable for the value of the property before it bestowed any labor or expense upon it. Moreover, plaintiff argues: first, since the contract was a liability, Commercial has no claim for damages, and second, even if the contract had value, the conversion claim is for the contract price, less cost

of importation. Defendant argues that, where the value of property has been enhanced by the expenditure of a converter who has not acted in good faith, the plaintiff may recover the value of the property, as enhanced, without deduction of the converter's expenditures. Defendant's characterization of American, as a bad faith converter, is based upon three varieties of asserted notice by American of Commercial's interest; any one of which, defendant seems to argue, renders American a bad faith converter; (a) actual notice; (b) constructive notice (should have known); and (c) record notice.

 We believe the New York rule to be that the plaintiff, in an action for conversion, can recover the enhancement value, produced by the wrongdoer's labor, only if the wrongdoer acted intentionally or in bad faith. *Allen v. Fox*, 51 N.Y. 562, 563 (1873); *Rapid Machine Works v. Silberstein*, 136 Misc. 837, 838, 241 N.Y.S. 68, 69 (New York City Ct., 1930), *rev'd on other grounds*, 140 Misc. 30, 248 N.Y.S. 735 (Sup.Ct. App.Term, 1930); 10 N.Y. Jurisprudence, *Conversion* § 74 (1960); 53 N.Y. Jurisprudence, *Secured Transactions* §§ 96, 214 (1967); 89 C.J.S. *Trover & Conversion* § 169 (1955). *Compare, Baker v. Hart*, 5 N.Y.S. 345 (Supreme Court, Gen.Term, 1889), *rev'd on other*

---

24. We believe our interpretation is consistent with Section 1–106 of the Code, which provides, in part:

"(1) *The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but* neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law. (Emphasis added)

The remedy to which Commercial is entitled, according to Ideal's argument, would place Commercial in a substantially better position than if Walker had performed the contract. At a bare minimum, Commercial would have borne fifty percent of the cost of performance, and received perhaps the entire invoice price. The theory Ideal presses here would entitle Commercial to the entire invoice price without having borne any of the cost.

Ideal observes that results under Article 9 may, sometimes, be considered harsh. Truly, the pure of soul but empty-headed may suffer for ignoring the realities of commerce with which Article 9 deals. Indeed, although we find that American proceeded in good faith, American is, nevertheless, liable for conversion under Article 9. It is, of course, irrelevant that some may consider this harsh.

We do not reach our interpretation in an effort to ameliorate a harsh result dictated by Article 9. Rather, we simply do not believe that the particular harsh result sought by the defendant is warranted under Article 9. Compare, 1 N.Y. Jurisprudence, *Accession*, §§ 1, 4, 5, 6, 7 (1958).

*grounds*, 123 N.Y. 470, 25 N.E. 948 (1890).

■ We have already found that American did not have actual knowledge of Commercial's interest. We do not believe that the other two categories of notice are sufficient to warrant an award of enhancement value against American [25].

■ The general purpose of damages in conversion is to provide indemnity for all actual losses or injuries sustained as a natural and proximate result of the converter's wrong. The measure of damages, generally employed, is the value of the property, with interest from the time of conversion, at the time and place of the conversion. However, it is appropriate to use whatever measure of damages accomplishes the general objective of indemnity under the particular circumstances. *Camera Mart, Inc. v. Lumbermans Mut. Cas. Co.*, 58 Misc.2d 448, 452–53, 294 N.Y.S.2d 941, 946 (New York City Ct., 1968), *aff'd*, 64 Misc.2d 860, 316 N.Y.S.2d 421 (Sup.Ct., App. Term, 1969); 10 N.Y. Jurisprudence, *Conversion* §§ 69, 70, 71 (1960); 89 C. J.S. *Trover & Conversion* §§ 162, 163, 165, 171 (1955); 18 Am.Jur.2d *Conversion* §§ 82, 83, 86, 95 (1965).

■ ■ We, of course, reject plaintiff's assertion that the contract had no value. Aside from its assertion of zero value, plaintiff's only suggestion is the contract price, minus cost. Since neither plaintiff nor defendant have made any further analysis or suggestions, we will use that suggested measure of dam-

ages; in which case the amount is— $7,071.40. Interest is inappropriate in that the aggrieved party has had the use of the monies paid for the goods.

2.

There remains the proper amount which Ideal may retain for damaged and/or inferior goods.

Section 9–318(1) of the Code provides as pertinent:

"[The] rights of an assignee are subject to

(a) all the terms of the contract between the account debtor [26] and assignor and any defense or claim arising therefrom; and

(b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment."

■ Ideal then was entitled to offset against the amount due to American, under the invoices, amounts attributable to damaged and/or inferior goods from the deliveries at issue here and amounts attributable to such goods from past transactions, accruing prior to the time that Ideal received notification of the assignment.

The evidence on such damages was presented through the testimony of Messrs. Haber and Pasternak, set out above. We conclude that Ideal has proven a claim for $839.64.

■ The only attack made by plaintiff on this testimony was directed at

**25.** The only case relied upon by defendant on this issue is *Baxter House, Inc. v. Rosen*, 27 A.D.2d 258, 278 N.Y.S.2d 442 (1967). We agree with defendant that this case illustrates the New York differentiation between an innocent converter and one who acted in bad faith. Defendant correctly synopsizes this case as one allowing recoupment, in the case of an intentional conversion of funds used to pay insurance premiums, of both the funds and the increment of insurance proceeds, arising from the use of the funds.

However, we do not believe this case to be inconsistent with the result reached herein. The converter in Baxter House had actual knowledge and the beneficiaries under the policy had contributed nothing of value.

**26.** "Account debtor" means the person who is obligated on an account, chattel paper, contract right or general intangible, Section 9–105(1)(a); and, in the present context, refers to Ideal. The New York and Pennsylvania versions of 9–318 are identical.

whether or not the figures could be attributed to the goods delivered by American. In part, that problem is irrelevant; for, we conclude that the evidence supports a finding that the amount $839.64 is attributable to either the American performance or previous Ideal-Walker transactions out of which a claim accrued on behalf of Ideal against Walker, prior to Ideal's receipt of notice of the assignment at issue.

■ We have concluded that the remaining amount—$2,702.76—which was deducted from the invoice price, pursuant to the Ideal-Commercial indemnity agreement, cannot be set-off. The figure of $839.64 was supported by the testimony of Mr. Haber to the effect that the figure represented actual damages. The larger figure was an approximation; however, there was no evidence presented at trial to render that figure anything more than speculative. Consequently, Ideal did not meet its burden of proof in that regard.

■ There is the final matter of interest. As we previously noted, we conclude that New York law governs the propriety of interest and the rate thereof. We believe that prejudgment interest is appropriate in this case. *See,* N.Y. Civil Practice Law and Rules §§ 5001, 5002 (McKinney, 1963); 13 N.Y. Jurisprudence, *Damages* §§ 131, 133 (1960). Interest shall be computed from May 13, 1969. Delivery, under the purchase orders, was completed on March 14, 1969 and the invoices contained a sixty (60) day payment term. Interest shall be computed as follows: from May 13, 1969 to August 30, 1972, inclusive, at the rate of seven and one-half (7½) percent, *Donald Alfred Gray Assoc. v. Commonwealth Corp. D. Co.,* 363 F.Supp. 1313, 1315 (E.D.Pa.1973); and from September 1, 1972 to the date of judgment, inclusive, at the rate of six (6) percent. N.Y. Civil Practice Law and Rules § 5004, as amended effective September 1, 1972 (McKinney, 1974–75 Supp.).