**PETRON TRADING CO., INC.**

v.

**HYDROCARBON TRADING AND TRANSPORT CO., INC.**

No. 84–3127.

United States District Court, E.D. Pennsylvania.

May 20, 1986.

On Motion for Reconsideration Nov. 3, 1986.

Erik N. Videlock, Jon A. Baughman, Martha A. Toll, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Petron Trading Co., Inc.

Mark L. Austrian, John B. Williams, Collier, Shannon, Rill & Scott, Washington, D.C., and Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, Pa., for Hydrocarbon Trading and Transport Co., Inc.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

Plaintiff Petron Trading Co., Inc. (Petron) brought this diversity case alleging that defendant Hydrocarbon Trading and Transport Co., Inc. (HTT) received and retained money from various third parties that was actually owed to plaintiff. The amended complaint (hereafter referred to as the complaint) states three causes of action, for conversion, unjust enrichment, and fraudulent misrepresentation. Defendant moved for summary judgment; the parties filed numerous memoranda, argued the motion orally, and then filed two rounds of supplemental submissions. The motion is now ripe for disposition.

The case arises out of the contractual relationships that each of the parties had with a third party, Alpha Petroleum Co. (Alpha). On September 10, 1982, the Office of General Services for the State of New York awarded a contract to Alpha to supply fuel oil to various political subdivisions of New York State through July 31, 1983. Complaint, Ex. B. In the fall of 1982, Alpha entered into a contract with defendant, in which defendant was to meet Alpha's responsibilities under its New York contract by supplying the fuel oil to the designated state recipients. Defendant would send its invoices to Alpha, and Alpha would send invoices to the State. Payments by the State were addressed to Alpha, but were sent to a lockbox at the Bank of New York maintained jointly by Alpha

and defendant. A minimum balance of $35,000 was kept in the account, and payments in excess of that were forwarded by wire transfer to one of defendant's accounts in Texas. According to an affidavit, attached to defendant's motion, by Roger K. Ego, Chief Accountant for the defendant, defendant "had no knowledge of which invoices sent to Alpha had been paid by Alpha," and "[a]t any one time, HTT would only know the total amount which had been invoiced to Alpha and the total amount received from Alpha." Later in 1982, defendant terminated its contract with Alpha, and made its last delivery of fuel oil on December 3, 1982.

On November 30, 1982, Alpha entered into a contract with plaintiff that was similar to the one it had had with defendant. Complaint, Ex. A. Plaintiff was to supply fuel oil to the state recipients, and to send invoices to Alpha. Alpha would then prepare an invoice for the state, which plaintiff would mail. The state recipients were to send their payments to Alpha at an address which was in fact a lockbox jointly maintained by Alpha and plaintiff at the European/American Bank in New York.

In addition to the lockbox arrangement, a security feature common to both the Alpha/Petron contract and the Alpha/HTT contract, the Alpha/Petron contract included an additional security provision. In paragraph 3(b) of the contract Alpha granted Petron a security interest in Alpha's rights to payment from New York State:

As security for the prompt and unconditional payment for the Oil sold to it hereunder, and the performance of all of Alpha's other obligations hereunder, Alpha hereby grants to Petron a security interest and a general lien upon, and does hereby pledge, assign and transfer to Petron all of its right, title and interest in, to and under Alpha's rights to payment from the State under the Contract, now existing or hereafter arising.

Early in 1983, plaintiff became aware that it was not receiving timely payments in the lockbox. It is not clear when plaintiff began to suspect that payments that should have been sent to its lockbox were

in fact being sent to the lockbox maintained by Alpha and defendant. On February 24, 1983, plaintiff sent a letter to Alpha in which plaintiff asked for "a list of payments received by Hydrocarbon Trading that should have been remitted to our lockbox." When it received no reply, plaintiff's President, Charles F. Hurchalla, sent a letter to defendant on March 14, 1983, asking for defendant's assistance in determining whether HTT had received any payments that should have been sent to Petron. Attached to this letter was a copy of the February 24 letter to Alpha. Complaint, Ex. E. There is no record of any written response from defendant to the March 14 letter, but plaintiff asserts that, in a follow-up phone call, defendant's President, Gerald LaBouff, stated that he was unaware of any mistaken payments. Complaint, ¶ 19. On August 3, plaintiff sent defendant a telex asking defendant to investigate the matter, and defendant replied that it lacked sufficient information to respond. Complaint, Exs. F, G. Plaintiff now alleges that from January, 1983, through August, 1983, "at least $542,718.15 [in payments owing to Petron] were mistakenly mailed by several of the state entities" to the lockbox maintained by Alpha and defendant. Complaint, ¶ 9.

At oral argument, counsel for defendant conceded "for the sake of this argument" that some payments for deliveries made by plaintiff were sent to defendant's lockbox. Tr. at 12. Counsel for defendant maintained, however, that defendant took from the lockbox only the money owed it by Alpha, and that it returned payments in excess of what it was owed to Alpha:

> We get to a situation in May of 1983, when all of a sudden, $140,000 gushes through the lockbox into our accounting department. At that point they took a look at what was opened, and they realized that Alpha's account in New York State was pretty much paid up, but Alpha had other accounts with them, that Alpha owed $65,000. We kept that [$]65,000, offset it against the different account, took the remaining $75,000—it's actually $76,000—sent it back to Alpha, said it's overpayment, and instructed the

Bank of New York to terminate the lockbox agreement. We don't have a single penny in our possession for which we did not provide fuel oil. I don't think there's any dispute on that today.

Tr. at 9. In his affidavit, Roger Ego, defendant's Chief Accountant, states:

> 5. HTT received payment from the Alpha lock box in May, 1983. On May 23, 1983, [defendant] received a wire transfer of $98,500.00 from Alpha which resulted in any [sic] overpayment of the monies owed HTT by Alpha. Pursuant to Alpha's instructions, HTT returned the excess of $76,261.93 to Alpha on May 24, 1983, and instructed the Bank of New York that the lock box arrangement was to be terminated.
>
> 6. Since this litigation was filed, I have reviewed the Alpha account and have been unable to reconcile the account to the penny. It appears that in June, 1983, the Alpha account showed a credit of $93.81. This credit was later removed and I have not yet been able to determine the reason for the appearance or the removal of this credit. Except for this possible credit of $93.81, however, HTT has no funds received from Alpha which were not owed it by Alpha.

Plaintiff has not submitted any evidence that contradicts these paragraphs of the affidavit, and defendant argues that Ego's conclusion that defendant had not kept more funds than Alpha owed it is not in dispute. At argument, however, counsel for plaintiff contended that the Ego affidavit was not entitled to any weight. Counsel noted that the documents on which the affiant relied are not attached to the affidavit, and that some of these documents have not been produced through discovery. Tr. at 42.

*Payments at Issue*

Although nowhere treated in the parties' written submissions, a threshold issue arises as to the nature of the payments at issue. Petron claims in its complaint that HTT mistakenly received payments of $542,718.15. Petron divides this sum into payments mailed before May 24, 1983 (the

day HTT terminated its lockbox arrangement) and after May 24, 1983. The "pre–5/24/83" payments are listed in ¶ 10 of the complaint; they total $290,613.69. The "post–5/24/83 payments" are alleged in ¶ 11 to total "at least $252,104.46." Plaintiff alleges that defendant received and retained exclusive control over the pre–5/24/83 payments, complaint at ¶ 12, and that plaintiff "never recovered" the post–5/24/83 payments.

According to the affidavit of Chief Accountant Ego, defendant: (1) did not receive any post–5/24/83 payments; (2) kept only those pre–5/24/83 payments that covered outstanding debts owed by Alpha; and (3) returned to Alpha any extra payments. As plaintiff noted at oral argument, the Ego affidavit is not accompanied by any supporting documentation. From the statements made at oral argument, it appears that plaintiff has been allowed to review defendant's accounts related to its fuel oil contract, but not other records which may also be relevant. For example, defendant stated at argument that it used lockbox payments to offset a $65,000 debt on a "different account" with Alpha. Tr. at 9. Plaintiff responded at argument that it had not seen the records of this different account, tr. at 42, but conceded that it had received "documents related to the Alpha/New York contract," *id.*

On the basis of the evidence submitted and the representations of counsel at argument, I conclude that there is no evidence that defendant received or had control over payments mailed to the lockbox after May 24, 1983. As to payments made prior to May 24, 1983, defendant concedes that some of the payments may have been mistakenly sent to its lockbox rather than to plaintiff's, but maintains (1) that it kept only those payments to which it was enti-

tled, and (2) that plaintiff has no valid security interest in those payments. Because the Ego affidavit lacks supporting documentation, and because plaintiff has not had access to the records of "a different" Alpha/HTT account totalling $65,000 which was also offset by lockbox payments, I cannot conclude at this point that defendant kept only payments sufficient to cover debts that it was owed by Alpha. Thus, the question of whether HTT received and kept payments in excess of the amount owed it by Alpha will remain open pending further discovery and submissions. Since defendant concedes that it did use some mistaken payments to offset the money Alpha owed it for deliveries of fuel oil, however, it is appropriate to consider its motion for summary judgment as to those payments. I will therefore turn now to defendant's contention that plaintiff had no valid security interest in any of Alpha's payments mistakenly sent to HTT's lockbox which HTT kept to offset outstanding Alpha accounts.

## *Applicability of the U.C.C.*

In addressing whether payments mistakenly sent to defendant's lockbox were payments which defendant could properly use to offset its Alpha account, I must first determine whether the claim that plaintiff makes to those payments is one to be evaluated according to the common law of assignments [1] or according to Article 9 of the Uniform Commercial Code.[2] Article 9, which governs secured transactions, applies "(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property of fixtures including goods, instruments, general intangibles, chattel paper or accounts; and also (b) to any sale of accounts or

---

1. Because federal jurisdiction in this case is based in diversity, I must look in the first instance to Pennsylvania law for the applicable conflict-of-laws rule. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pennsylvania courts must look to the law of the place with the most significant relationship to the parties and to the transaction. *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

It is clear that the "center of gravity" in this matter lies in New York; accordingly, I will apply New York law.

2. All references are to the 1978 Official Text of the U.C.C. New York has adopted this text, and all sections referred to herein are identical to those in the New York Uniform Commercial Code (McKinney, Vol. 62½ (1985)).

chattel paper." Uniform Commercial Code § 9–102.

The Alpha/Petron contract appears on its face to create a security interest covered by § 9–102. Paragraph 3(B) of the contract, quoted in full *supra*, states in pertinent part that:

> *Alpha hereby grants to Petron a security interest* and a general lien upon, and does hereby pledge, assign and transfer to Petron all of its right, title and interest in, to and under Alpha's *rights to payment from the State under the Contract*, now existing or hereafter arising.

(Emphasis added.) Paragraph 10 of the contract is consistent with the view that ¶ 3(B) creates a security interest:

> 10. Alpha agrees, at any time or from time to time hereafter, upon the request of Petron to give, execute and deliver any instrument, agreement or other document that Petron deems necessary or desirable in order to carry out this Agreement, and to consummate and effect the transactions contemplated hereby (including, without limitation, to create, preserve, protect or validate any security interest granted to Petron hereunder).

The language of these two provisions suggests that the parties did in the words of § 9–102 "intend[ ] to create a security interest" in Alpha's rights to payment from the State for fuel oil.

■ The next issue is whether the interest in "rights to payment" is the sort of interest encompassed by § 9–102. Section 9–106 defines several terms used in the U.C.C., including the term "account": " 'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." I conclude that Alpha's right to payment from the State for fuel oil delivered under its contract with the state is an "account" within the meaning of § 9–106. Since § 9–102 encompasses transactions in which the parties intend to create a security interest in accounts, I further conclude that the transaction at issue here is one encompassed by Article 9.

■ Plaintiff argues, however, that the transaction is nevertheless excluded from Article 9 by virtue of § 9–104(f), which excludes from Article 9 "a transfer of a contract right to an assignee who is also to do the performance under the contract." According to plaintiff, the contract between the parties should be interpreted as one in which Alpha transferred its contract right to payment from the state to an assignee, Petron, who was also to do the performance under the contract, i.e. to deliver the fuel oil.

Defendant responds first by referring to ¶ 6 of the Official Comment on § 9–104, which discusses exclusion 104(f). The Official Comment states:

> Paragraph (f) excludes from the Article certain transfers of such intangibles which, by their nature, have nothing to do with commercial financing transactions.
>
> Similarly, this paragraph excludes from the Article such transactions as that involved in *Lyon v. Ty-Wood Corporation,* 212 Pa.Super. 69, 239 A.2d 819 (1968) and *Spurlin v. Sloan,* 368 S.W.2d 314 (Ky. 1983).

Defendant argues that this is not the sort of transaction that has "nothing to do" with commercial financing. The sort of transaction that would be excluded under the language quoted from § 104(f), according to defendant, would be one that involved an absolute assignment of a contract, one where the assignor extricated itself completely from any role or interest in the performance of the contract or in the receipt of payment for performance.

As further support for this construction of § 104(f), defendant notes that both of the cases cited in Official Comment ¶ 6 as illustrative of exempt transactions involve absolute assignments. For example, in *Spurlin,* a contractor who completed a contract for road construction assigned the funds due to him from the state to his bank, in order to satisfy a loan he had taken from the bank. The contractor wrote the state and told them to pay the bank directly, and wrote the bank and told them to expect payment on his loan from

the state. The court held that this arrangement did not create a security interest, but was rather an absolute assignment of a right to collect money due and owing.

In this case, defendant argues, Alpha did not absolutely assign its contract with New York State to Petron. In the first place, the payments were addressed to Alpha, and were referred to in the Alpha/Petron contract as payments by Alpha to Petron. According to ¶ 3(A)(ii) of the Alpha/Petron contract, "[R]eceipt of timely payment into the Account from the State shall be deemed payment hereunder by Alpha for the subject oil." Thus payment was not made directly from the State to Petron. Second, although Petron took over Alpha's responsibility to deliver fuel oil, Petron did not send invoices directly to the State, but rather sent invoices to Alpha, which then prepared invoices for the State. Third, Alpha retained in ¶ 2 of the contract the right "to file petitions for 'extraordinary adjustments' which it (to the exclusion of Petron) may be eligible to lawfully receive under the Contract (in light of the aforementioned pricing arrangement provided in this Agreement)." In these three ways, defendant concludes, Alpha's assignment of its New York State contract to Petron was incomplete.

In response, plaintiff relies on *American East India Corp. v. Ideal Shoe Co.*, 400 F.Supp. 141, 156–58 (E.D.Pa.1975), where the court found that American East India Corp. was a performing assignee and therefore exempt from the U.C.C. under § 104(f). Plaintiff does not attempt to compare the intricate factual pattern at issue in *American East India* with the record developed in this case. As the court in *American East India* implicitly recognized, however, an inquiry into the applicability of § 104(f) is highly dependent on the particular facts of the case. 400 F.Supp. at 155. The facts in the present case bear no obvious resemblance to those at issue in *American East India*, which involved "principally an outlay of money with ancillary rendition of service." *Id.* at 156.

Section § 104(f) does not state explicitly that only "absolute assignments" are to be exempt, but the Official Comment and the cases cited therein make clear that only those transactions having nothing to do with commercial financing, transactions such as absolute assignments of contract rights, are exempt. *See* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 894 (1980). According to Professor Gilmore, the drafters intended to exclude transactions which were "not financing operations, which it made no sense to file, and which no one would ever think of filing." G. Gilmore, *Security Interests in Personal Property*, § 10.5 (1965); *accord* White & Summers, *supra*, at 927 and n. 130. Absolute assignments of contract rights when the assignee is also to do the performance under the contract are examples of transactions "which it would make no sense to file," since the transaction is not one about which potential creditors of the assignor would have reason to be concerned. Conversely, transactions in which the assignor retains some role may well be ones of concern to other creditors.

In this case, we do not have a complete assignment of Alpha's contract with New York. Alpha retained rights to petition for price adjustments, continued to prepare invoices for the oil delivered, and did not notify the State of Petron's involvement. Accordingly, in contracting with Petron, Alpha did not extricate itself from its contract with the State; the transaction thus differs significantly from that in *Spurlin v. Sloan*. Instead, Alpha entered into a kind of sub-contract with Petron for delivery of goods (fuel oil), with Petron holding a security interest in Alpha's right to payments from the state. The Petron/Alpha transaction is also somewhat akin to a commercial financing transaction, in that it afforded Petron a means of obtaining the oil it needed to make the deliveries it contracted to make. It is therefore not exempt under § 104(f).

*Perfection of the Security Interest*

In order to have a valid security interest under Article 9, the party claiming the interest must have perfected that interest. When the collateral in which a party holds

a security interest is an account, the only way to perfect the security interest is by filing a financing statement. Section 9–302; see G. Gilmore, *supra*, at § 12.6, 383–84. It is undisputed that Petron did not file a financing statement until September 1983, long after the relevant events in this litigation. It would seem, then, that plaintiff's interest must be considered unperfected under the U.C.C.

Plaintiff initially contended that its security interest was automatically perfected, however, under § 9–302(1)(e), which exempts from the filing requirement "an assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor." At oral argument, the parties were not prepared to state whether the Alpha/Petron contract assigned to Petron a security interest in a significant part of Alpha's outstanding accounts. By letter dated October 16, 1985, however, plaintiff conceded that the accounts assigned did constitute "a significant part" of Alpha's outstanding account, and that Petron's security interest could not have been exempt under § 9–302(1)(e) from the filing requirement.

■ In a second post-argument submission, plaintiff raises a new argument for automatic perfection under § 9–304(4). This section reads:

> A security interest in instruments or negotiable documents is perfected without filing or the taking of possession for a period of 21 days from the time it attaches to the extent it arises for new value given under a written security agreement.

As determined earlier in this Memorandum, *supra* p. 1158, the collateral in which plaintiff obtained a security interest—i.e. rights to payment from the State—was an account. In plaintiff's view, however, its interest lay not only in the rights to payment—which plaintiff evidently concedes to be accounts—but also in the checks written by the State and sent to the lockboxes, which plaintiff argues are instruments.

Thus plaintiff concludes that it holds a security in instruments as well as in accounts.

Defendant responds that § 9–304(4) is not available because plaintiff's security interest lay only in accounts, not in instruments. In the context of this transaction, defendant argues, the actual payments by the state were not collateral in which plaintiff had a distinct security interest, but were at most proceeds of accounts. A security interest in proceeds of accounts is continuously perfected if the interest in the underlying collateral is perfected. If the underlying interest is not perfected, however, the security interest in the proceeds lapses ten days after receipt of the proceeds by the debtor. Section 9–306(3).

Plaintiff's attempt to characterize its security interest as one in instruments as well as in accounts is not persuasive. The description of the collateral in the Alph/Petron contract is not a description of instruments, as defined in § 9–105(i) and § 3–104, but rather one of accounts. Furthermore, the legislative history of the exceptions to the filing requirement in § 9–304(4) and 9–304(5) suggests "that these two subsections were designed for short term bank loans." J. White & R. Summers, *supra*, at § 23–9, p. 928. Although the subsections are not expressly limited to such transactions, I see little sense in extending § 9–304(4) to a transaction such as this one, in which even plaintiff concedes that, at a minimum, the collateral involved accounts. Furthermore, plaintiff has cited to no case or other authority to support its proposed construction of § 9–304(4) and its definition of "instruments." I conclude that plaintiff's security interest in Alpha's rights to payment from the State was not automatically perfected under § 9–304(4).

### Priority of Claims

■ According to § 9–201, a party with an unperfected security interest generally takes priority over an unsecured creditor. There are several exceptions to this general rule, however, and defendant relies on the exception in § 9–301(1)(d):

(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of:

. . . . .

(d) in the case of accounts and general intangibles, a person who is not a secured party and who is a transferee to the extent that he gives value without knowledge of the security interest and before it is perfected.

Defendant argues that this is a case involving accounts, and that defendant is a transferee to the extent that it gave "value," in this case, fuel oil, without knowledge of planitiff's security interest and before that interest was perfected. Defendant states that its last delivery of fuel oil was December 3, 1982. Defendant's reply brief at 5. The earliest date that Petron alleges telling any HTT official about its arrangements with Alpha is sometime in January, 1983. Hurchalla affidavit, at ¶ 24.

Plaintiff argues first that this subsection is inapplicable because the collateral involved is not accounts but instruments. For the reasons already stated, I am not persuaded by plaintiff's characterization of the collateral.

Plaintiff also argues that defendant cannot properly be considered a "transferee." Plaintiff's argument is that a party can be considered a transferee only if a transferor intentionally transfers something to it. In this case, because the disputed payments arrived in defendant's lockbox by mistake or accident, and not by the intent of either Alpha or the State, plaintiff concludes that defendant cannot be considered a transferee.

Defendant reponds simply that in light of its having given value to Alpha, it must be considered to be a transferee for any payments it subsequently received from Alpha. Neither party has referred me to any case law on the subject, and the U.C.C. provides no definition of transferee. The definitions provided of transfer in *Black's Law Dictionary* do not define the term with any precision; if any conclusion may be made from them, however, it is that "transfer" is a broad term that has not traditionally been understood to require the kind of purposive intent that plaintiff would ascribe to it.

The question would be closer if defendant had no relation whatsoever with Alpha, and had found the payments in its lockbox as a result, for example, of an error by a postal filing clerk. In this case, however, defendant had an ongoing relationship with Alpha. Defendant made deliveries of fuel oil pursuant to its contract with Alpha, sent invoices to Alpha, and received payment from Alpha via a lockbox arrangement. In this arrangement, the payments, although sent by the State, were payments by Alpha. While it may be difficult, if not impossible, to determine whether Alpha or State officials intended that plaintiff or defendant receive a particular individual payment, it is possible to conclude that Alpha and the state intended to transfer to defendant funds sufficient to pay for the oil defendant delivered. Thus I conclude that defendant may be considered a transferee for payments received for fuel oil that defendant delivered under its contract with Alpha. Accordingly, defendant's interest in these payments would take priority over plaintiff's unperfected security interest under the terms of § 9–301(1)(d).

I will therefore grant summary judgment for defendant. This judgment will extend, however, only to those payments equal to Alpha's debt to defendant. As I stated earlier in this Memorandum, the record is not sufficiently detailed to allow me to conclude that defendant kept only those payments equal to the money Alpha owed it, and returned all excess payments to Alpha. Plaintiff has challenged the affidavit on which defendant relies, and has not been afforded the opportunity to review all of the documents which defendant's chief accountant reviewed in preparing that affidavit. I will therefore order that defendant make available the documents on which its accountant relied, and any other materials that might reasonably bear on the question of whether defendant kept payments in excess of what it was owed.

An appropriate Order is attached.

ON MOTION FOR RECONSIDERATION

On May 20, 1986, this court issued a Memorandum and Order partially granting defendant's motion for summary judgment. Plaintiff has filed a motion for reconsideration of that order. In addition, plaintiff has moved for clarification as to the effect of that order on one of its claims. The facts of the case are summarized in our earlier memorandum, and need not be repeated here.

### I. Motion for Reconsideration

██ Plaintiff continues to argue that it has an interest in the checks sent to defendant's lock box not merely as proceeds of collateral, but as original collateral. That argument has already been made and rejected, as have the other arguments plaintiff now raises. Since our memorandum did not discuss this issue at length, however, we do not find it superfluous to supplement our earlier discussion.

Plaintiff argues that this court made an error of law in determining that "[t]he description of the collateral in the Alpha/Petron contract is not a description of instruments, ... but rather one of accounts." Alternatively, plaintiff argues that this court made an impermissible factual inference against it by assuming that the parties to the contract intended to limit plaintiff's security interest to accounts. We disagree.

Plaintiff argues that the Code does not define "rights of payment," the phrase used to describe the collateral, to mean "account." Rather, "account" is defined by § 9–106 of the U.C.C. as "any right of payment ... *which is not evidenced by an instrument or chattel paper....*" (emphasis added). "Instrument" is defined by § 9–105(i) in part as "... any ... writing which *evidences a right to the payment of money ...*" (emphasis added). Plaintiff's position appears to be that the "right to payment" described as collateral in the contract is an account before it is evidenced in writing (before the state writes a check in partial satisfaction of its obligations under the account), and becomes an instrument once it is evidenced in writing.

We held, and continue to hold, that this interpretation of the contract language is unreasonable, and that summary judgment on this issue is appropriate. We do not dispute that the language of the contract refers to "rights to payment" and not to "accounts." Nonetheless, we do not find it reasonable to interpret the contract language to mean that checks issued by the state in payment of its account obligations are to be treated as original collateral rather than as proceeds of collateral. *See, e.g., Air Florida Systems, Inc.*, 49 B.R. 321 (Bankr.S.D.Fla.1985) (treating payments on account as proceeds). We do not here question that parties could contract to treat after-acquired proceeds as original collateral. *See* Weiss, *Original Collateral and Proceeds: A Code Puzzle*, 1C Bender's Uniform Commercial Code Service § 24.-12[1] & [2] (1986); U.C.C. § 9–204. But we hesitate to think it reasonable to interpret a contract as intending to do so absent clearer language than is present in this case.

Great uncertainty would be generated by the result sought by plaintiff. The characterization of collateral is vital to the rules governing perfection of security interests. Proceeds routinely come in the form of checks or other instruments. The fact that one characteristic of an instrument under Article 9 is that it evidences a right to the payment of money does not, in our view, render it reasonable to interpret the words "right to payment" as expressing an intention to contract around the Code provisions governing proceeds and the perfection of interests in proceeds. Any rule of interpretation that so readily permitted collateral to take on the "form" of its proceeds would make it exceedingly difficult for parties to know what they must do to perfect their interests. Such uncertainty can be prevented, without interfering with the creativity of drafters of commercial financing contracts, by requiring a clear statement in the contract that the parties intend to treat proceeds as collateral.

### II. Motion for Clarification

██ Our order of May 20, 1986, did not indicate specifically whether summary

judgment was granted on all counts. Plaintiff requests clarification as to whether summary judgment was granted against it on its fraudulent misrepresentation count.[1] Defendant has responded that "[t]he fraudulent misrepresentation count was denied by virtue of the Court's holding that [defendant] was entitled to all the funds it had retained."

We held in our May 20, 1986 memorandum that defendant's interest in the checks had priority over plaintiff's interest because plaintiff's security interest was unperfected and defendant was a transferee under § 9–301(1)(d). We did not, however, make clear the implication of that holding for plaintiff's fraudulent misrepresentation claim. The question was raised by the court at oral argument, but not resolved.[2] Plaintiff's current position is that the fraudulent misrepresentation claim survives our holding that defendant had the superior interest under Article 9. Yet plaintiff has still not clearly articulated why this is the case. Plaintiff merely argues, as it did at oral argument, that its allegations are legally sufficient to state a common law fraud claim and are unrefuted by competent evidence.

Nonetheless, plaintiff's amended complaint does support a theory upon which our Article 9 holding would not be dispositive against plaintiff on its fraudulent misrepresentation claim. In essence, plaintiff alleges that, but for defendant's fraudulent misrepresentations, plaintiff would not have been in the position of holding a mere unperfected security interest in the proceeds. Had defendant informed plaintiff that checks were arriving in defendant's lockbox in excess of the amount owed defendant by Alpha under Alpha's account in New York State, plaintiff could have taken steps to perfect its interest in its Alpha-New York State account and its proceeds.

This theory is consistent with our earlier decision and would serve to preserve plaintiff's fraudulent misrepresentation claim. Our earlier decision holds that, due to the actual course of events, defendant had the superior interest. We did not hold that, as an abstract matter, defendant was "entitled" to the checks and plaintiff was not. Thus, it remains open to plaintiff to prove that the course of events leading to defendant's position of Article 9 priority as to the checks would have been different but for the alleged fraudulent misrepresentations by Hyrdocarbon's president.[3]

We conclude from the record that summary judgment as to the fraudulent misrepresentation claim is inappropriate: questions of material fact remain as to the content of the statements alleged to have been made by Hydrocarbon's president, the knowledge and intent behind them, whether Petron's president did in fact rely on them, and whether it was reasonable for him to have done so.

1. As discussed in our earlier memorandum, plaintiff alleges that defendant's president misled plaintiff's president by stating that no payments for plaintiff's shipments were being received by defendant. Plaintiff alleges that these representations were false, that they were intended by defendant to "lull [plaintiff] into inaction,", that plaintiff reasonably relied upon these statements, and that plaintiff suffered damages thereby since it refrained from taking action to protect its interests.

2. The exchange between the court and plaintiffs' counsel was as follows:
   Mr. Videlock: Either we're in the common law of assignments, or we're in Article 9....
   The Court: But if we are within Article 9, then we pursue that analysis, I take it, through § 301(1)(d).... But if you lose on that analysis, then we've gone past the common law assignment. Is that a problem?

   Mr. Videlock: Yes, your honor.
   The Court: Where does the misrepresentation claim lie at that point?

3. We need not detail here what methods were available to plaintiffs. But we do think it appropriate to clarify the import of our statement that "it is possible to conclude that Alpha and the state intended to transfer to defendant funds sufficient to pay for the oil defendant delivered." Memorandum at 18. This statement was made in the context of our determination that defendant was a transferee under § 9–301(1)(d). In the course of our discussion of that issue, we also questioned whether intent was relevant to the issue of whether defendant was a transferee. We thus view our statement as to the possible intent of Alpha and the state as dictum.

### III. *Motion to Compel Production of Documents*

On May 20, 1986, this court ordered defendant to produce all documents on which its Chief Accountant, Roger Ego, relied in preparing his affidavit, and any other materials bearing on the question of whether defendant kept payments in excess of what it was owed by Alpha. That question remains at issue, as plaintiff is entitled to the return of those funds notwithstanding the ultimate fate of its fraudulent misrepresentation claim. Plaintiff has brought to this court's attention the poor quality of the photocopies it has been provided. In addition, plaintiff has requested and has not received copies of cash receipts accounting records, which we conclude are encompassed by our May 20 order. Defendant will be ordered to produce copies of those records to the extent that they pertain to defendant's Alpha accounts.

An appropriate order is appended.